**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**TAMELA M. CHIEFFO,**

    **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　　　　　　　**Case No. 8:08-cv-710-T-TBM**

**MICHAEL J. ASTRUE,
Commissioner of the United States
Social Security Administration,**

    **Defendant.**
                                     /

**O R D E R**

The Plaintiff seeks judicial review of the denial of her claim for Social Security disability benefits. For the reasons set out herein, the decision is affirmed.

I.

Plaintiff was forty-three years of age at the time of her administrative hearing in August 2007. She stands 5', 3" tall and weighed 268 pounds. Plaintiff has a high school education and vocational training in cosmetology and cosmetic tattooing. Her past relevant work was a cosmetologist, tattoo artist, and salon attendant. Plaintiff applied for disability benefits in July 2004, alleging disability as of May 7, 2004, by reason of asthma, allergies, neck injuries, fibromyalgia, depression, high blood pressure, lower back trouble, carpal tunnel syndrome, and osteoarthritis. The Plaintiff's application was denied originally and on reconsideration.

The Plaintiff, at her request, then received a *de novo* hearing before an Administrative Law Judge ("ALJ"). The Plaintiff was represented at the hearing by a non-attorney representative and testified in her own behalf. Additionally, a vocational expert was called by the ALJ.

In essence, Plaintiff claimed disability based on the combination of several conditions. With regard to her allergies, Plaintiff said she is developing more each year and they cause her other conditions to worsen. Her allergies affect her breathing, cause blurry vision, and sometimes affect her hearing. The allergies also make her tired, and she is on antibiotics frequently because she is constantly dealing with an infection. Plaintiff stated the breathing difficulties are the "scariest" part of her allergies; she is always afraid that she will stop breathing because the inside of her nose all the way down to her lungs swells. Because of that, Plaintiff has difficulty sleeping. Her sleep is interrupted and she cannot nap during the day. Plaintiff described polyps that just keeping getting bigger and bigger, and she fights for air. Areas with pollen, dust, or mold bother her. The allergies cause her to have a dry mouth and she has to drink more, which makes her go to the bathroom a lot. According to Plaintiff, she cannot have flowers in her house because she is developing floral allergies, and she can no longer go four-wheeling, boating, or camping with her family. At times Plaintiff has tried to go on family outings because she is tired of being alone, but she knows that she will suffer the next day or month afterwards.

As for the arthritis, Plaintiff said she has it in every joint - her back, neck, wrists, and feet. Her feet are really bad, and she developed a fallen arch over the last year and a half. Plaintiff complained that the arthritis causes hot spots, burning, inflammation, and swelling.

2

She described spurs that get stuck which immobilize her and flare-ups that last six to eight weeks. She said she then has to be "bedridden until something snaps off and breaks or gets loose." Plaintiff described these episodes as very, very painful and depressing. When asked by the ALJ, Plaintiff stated that the pain in her back is the one she would like to get rid of most. On average, Plaintiff rated her the pain a three or four on a scale from one to ten. She has about three days a month when she is pain-free. She also indicated she suffers from fibromyalgia, which hits anytime and wherever it wants. She said it causes shooting pain and swollen muscles and aches. Her husband bought her a massage chair that pounds between her shoulders and lower back, which helps. Plaintiff stated that muscle relaxers and water exercises help a lot. She stated she also gets "a lot of electric shock."

As for her carpal tunnel syndrome, Plaintiff thought the surgeries for it would cure it but they did not. She switched from glass to plastic because of dropping things. She still gets little electric shocks down her arms to her fingers, legs, knees, and feet.

As for her depression, Plaintiff testified that she asked a doctor about it one time and was put on Zoloft. It made her blood pressure rise so she got St. John's Wart from the health food store instead. Sometimes she takes it and sometimes she does not. Plaintiff said she also occasionally has trouble with short-term memory but her concentration is okay. By her account, she recently has had a few problems getting along with other people and has had a few outbursts where she has been irritated and yelled at people.

Plaintiff also experiences occasional problems with balance, dizziness, and lightheadedness. She is not sure if it stems from inner ear problems, allergies, or medication. As for medication, Plaintiff testified that she takes Advair, Astalin, Avalide, Norvasc, Soma,

Lortab, Albuterol, Byetta, and Metformin. She also gets allergy shots once a week and carries an Epi pen in case of an emergency. The medications make her tired and sometimes make her head "feel like cotton candy." Plaintiff has also been treated with injections.

Plaintiff last worked doing tattoos. Plaintiff stated that she developed tremors and shaking when she was tattooing, which ended her career. Prior to that, Plaintiff had to quit hairdressing because of the pain in her back; she could not even bend over the shampoo pool. According to Plaintiff, when she first quit working she thought she was going to die. She slept and rested for a whole year. At that time, she could not drive for five minutes, walk to the end of the driveway, or pick up anything.

Plaintiff stated the maximum she can lift is five to fifteen pounds. Lifting more than that pulls her back, goes down the leg to the right knee and into the foot, and strains her neck and shoulder. She can walk five to twenty feet without difficulty but standing still is excruciating. By Plaintiff's account, she can stand five to fifteen minutes before having to sit or lie down on a good day; on a bad day she can stand for only a minute. Plaintiff can sit for longer periods of time, but she stated that she pays for it later. Her best position is sitting in the recliner because it takes the pressure off of her back and tail bone. She indicated it does help if she is able to stand up for a minute or two. Plaintiff does not have difficulty reaching her arms over her head if there is not a spur or she is not having a flare-up. She can pick up a pen and hold it for about ten minutes before cramping starts in her thumb. According to Plaintiff, one of her doctors told her not to twist or to bend to pick up things.

In describing a typical day, Plaintiff testified that she gets up around 6:30 a.m., goes back to bed, gets up again at 7:30 a.m. to let the dog out, and then actually gets out of bed for

good between 8:30 and 9:30 a.m. Immediately upon rising, she rinses the "sandman" out of her eyes; sometimes it is so bad her eyes are crusted over. Plaintiff attributes this to her allergies. Plaintiff also does stretches and exercises, which lets her know her limits for the day. She takes her medication, and, depending on whether or not she is nauseous, Plaintiff will eat breakfast. Depending on how she is feeling, she will make the bed, put in a load of laundry, do the dishes, and then sit in her recliner and take a nap. Plaintiff's husband comes home for lunch, and either she or he will make the lunch. After that, she will take the dog outside and then watch a couple of movies. She makes dinner if she is feeling okay, and if not, she will wait for her husband. If Plaintiff is having a bad day, she does not get out of bed, and she may or not take a shower. After her husband leaves for work, Plaintiff goes from the chair to the couch. She will also nap, and at times will sleep until her husband gets home from work. In the evening, Plaintiff and her husband will usually watch a movie together. Her husband usually grills out or they will order a pizza or sub. Then they will talk until bedtime. Plaintiff said she fights to go to sleep, tosses and turns, and is up three to four times a night because a leg twitch, tremor, electric shock, or her breathing wakes her. In total, Plaintiff said she gets about four to seven hours of sleep a night.

Plaintiff lives in a single-story home with her husband, oldest daughter, stepson, and dog. She has trouble with steps; if there are more than a couple she has to turn sideways, take one step at a time, and hold on to the railing. Plaintiff cooks once or twice a week. The kids clean up after dinner, and her husband and stepson take out the trash. The kids do the sweeping, mopping, and vacuuming. Plaintiff does some laundry; she has an extended arm for reaching and she leaves the clothes in a basket. Plaintiff occasionally has trouble with getting washed and dressed if she has a flare-up. She goes shopping when she feels well

enough to go.  She also goes to church once or twice a week, depending on what function is going on.  Plaintiff quit the choir because of all the standing and her allergies made it where she could not hit the notes.  Plaintiff can read but blurry vision sometimes causes difficulty.  She can write but she is a poor speller.  Plaintiff recently lost about 25 pounds.  Plaintiff drives, but usually not far.  She drove 57 miles to get to the hearing, which is the farthest she has driven in a year or two.  Plaintiff testified that she has problems driving at times because her allergies cause blurred vision; stress causes her to have rapid eye movement, three to four times a minute; when she gets nervous she sweats and that interferes with her breathing; and she gets nervous when driving somewhere new and when making sharp turns.  Plaintiff is right handed.  She likes arts and crafts and has tried different types.  She starts and stops constantly because of the sitting and [her] neck.  (R. 235-64).

Daniel Rappucci, a vocational expert ("VE"), testified next.  The VE identified Plaintiff's past work as a hair stylist as skilled, light exertional work; a tattoo artist as skilled, sedentary work; and a salon attendant as unskilled, light exertional work.  Upon a hypothetical which, in addition to Plaintiff's age, education, and work experience, assumed an individual capable of performing light exertional work who could occasionally climb ramps and stairs, kneel, or crouch but could not climb ladders, ropes, or scaffolds, the VE testified that Plaintiff could perform all of her past work.  Upon a second hypothetical that restricted the individual to working indoors, lifting up to ten pounds, and standing for an hour or two during the day with a sit stand option, the VE testified that none of Plaintiff's past work would be available.  However, the VE indicated that an individual with those limitations could perform work available in the national and regional economy such as an assembly worker (lens inserter), production worker, and inspection worker (cable worker).  The VE

6

opined that environmental limitations such as the exposure to dust, fumes, or odors would not affect the availability of those jobs. The VE opined further that it would not be possible to avoid all exposure to such, and if that was required, no jobs would be available. On the third hypothetical, which assumed Plaintiff's testimony as true and correct, the VE testified that no jobs would be available. (R. 265-74).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are addressed adequately by the parties' memoranda and are set forth herein as necessary.

By his decision of September 5, 2007, the ALJ determined that while Plaintiff has severe impairments related to asthma, osteoarthritis, bilateral knee problems, fibromyalgia, and obesity,[1] she nonetheless had the residual functional capacity to perform sedentary exertional work that involves standing for only one or two hours with a sit/stand option and did not involve exposure to pollen. Upon this finding, the ALJ concluded that while Plaintiff was unable to perform her past relevant work, she could perform jobs available in the local and national economy. Upon this conclusion, the Plaintiff was determined to be not disabled. (R.15-21). The Appeals Council considered additional evidence and denied Plaintiff's request for review.

---

[1]The ALJ also determined that Plaintiff's depression, anxiety, diabetes, and carpal tunnel syndrome were non-severe impairments having no more than a minimal effect on her ability to perform basic work activity and imposing no significant vocationally relevant limitations. (R. 15-16).

7

II.

In order to be entitled to Social Security disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See id.* at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate that he has done so. While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. *Celebrezze v. O'Brient*, 323 F.2d 989 (5th Cir. 1963).

8

Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. *Miles*, 84 F.3d at 1400; *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).

III.

The Plaintiff raises three claims on this appeal. As stated by the Plaintiff, they are as follows:

(1) The Decision by the ALJ that Claimant is capable of performing sedentary work that involves standing for one or two hours is not based on substantial evidence since no examining physician, including the physician hired by SSA to examine Claimant, has stated Claimant is capable of standing for one or two hours;

(2) The Decision by the ALJ that Claimant is capable of performing sedentary work is not based upon substantial evidence in that it does not take into account Claimant's limitations in fine manipulation as evidence[d] by the physician hired by SSA to examine Claimant;

(3) The ALJ, in finding Claimant's psychological impairments to be non-severe, erred by relying on the opinion of a file-reviewing medical expert ("ME") when the

Transcript of Record provides no evidence as to what records were reviewed by that physician as a basis for his statements.

By her first two claims, Plaintiff takes issue with the ALJ's assessment of her residual functional capacity. In particular, she argues that the ALJ's assessment is not supported by substantial evidence because (1) no examining physician has stated that she can stand for one or two hours, and (2) it did not account for the limitations in fine manipulation identified by an examining physician. Plaintiff claims both errors result from the ALJ's failure to mention and credit the reports of the consulting, examining physician, A. Del Pizzo,[2] M.D. Plaintiff also argues that the ALJ erred by relying on the opinions of non-examining doctors over that of Dr. Del Pizzo, an examining physician whose opinions are entitled to greater weight. According to Plaintiff, these errors require that her case be remanded for further consideration. (Doc. 24 at 13-17).

The Commissioner counters that Dr. Del Pizzo's opinions actually support the ALJ's determination of Plaintiff's residual functional capacity, not contradict it. By the Commissioner's reading of the evidence, Dr. Del Pizzo was documenting Plaintiff's complaints when noting limitations pertaining to standing, walking, and fine manipulation and did not comment on Plaintiff's functional capacity. Additionally, the Commissioner

---

[2]Dr. Del Pizzo examined Plaintiff in September 2004 and May 2005 upon request of the SSA. Plaintiff relies on the following notations from Dr. Del-Pizzo's written reports:
(1) that Plaintiff had a history of trauma to the LS spine with persistent pain radiation to both legs; occasional parathesia and right leg weakness, and she cannot climb stairs or walk on a level plane for more than 5 minutes due to LS spine pain and bilateral knee pain, R > L," (R. 148);
(2) that Plaintiff's fine manipulation was slightly decreased, R > L (R. 148);
(3) that Plaintiff's spine pain and muscle weakness enabled her to "stand no more than 10 minutes, walk no more than 100 feet, or even stand no (sic) more than 35 minutes;" (R. 192); and
(4) that Plaintiff's fine manipulation was decreased bilaterally L > R (R. 192).

10

urges that the doctor's objective findings on examination contradict Plaintiff's documented complaints. Regarding the non-examining doctors, the Commissioner points out that the ALJ did not fully credit their opinions and specifically stated so, and this is evidenced by his residual functional capacity determination for sedentary work which finds Plaintiff with greater exertional limitations than those found by the state agency doctors, i.e., the ability to perform sedentary work as opposed to light exertional. Furthermore, the Commissioner contends that an ALJ may rely on the reports of non-examining doctors where their opinions are supported by the record. (Doc. 29 at 5-9).

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(a). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Lewis*, 125 F.3d at 1440. If a claimant can still do the kind of work she has done in the past, then the Regulations require that she be found not disabled. At this stage of the evaluation process, the burden is on the Plaintiff to show that she can no longer perform her past relevant work. *Jackson v. Bowen*, 801 F.2d 1291, 1292 (11th Cir. 1986).

The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining doctor. *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). The reports of non-examining, reviewing physicians, when contrary to those of examining physicians, are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence on which to base an administrative decision. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 280

11

(11th Cir. 1987)). The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Upon careful consideration of the record, I am obliged to conclude that the ALJ's residual functional capacity determination is supported by substantial evidence and he did not err in relying, in part, on the residual functional capacity opinions of the non-examining, state agency doctors. First, to the extent that Plaintiff suggests that an ALJ's residual functional capacity determination is unsupported by the record if there is no statement from an examining (or treating) doctor on the same, I disagree. While it certainly would be beneficial to obtain and include such, Plaintiff cites no authority for that proposition and my research has not demonstrated otherwise.[3] As indicated by the regulations, an ALJ is the one responsible for assessing a claimant's functional capacity. 20 C.F.R. §§ 404.1546, 404.1527(e)(2). Second, while Plaintiff is correct that there is no mention of Dr. Del Pizzo's examinations and opinions in the ALJ's decision, the ALJ clearly considered the consulting doctor's records and opinions as he referenced them at the administrative hearing. (R. 269). Third, as for the "limitations" identified by Dr. Del Pizzo, I agree with the Commissioner and the ALJ that those notations were the doctor's recitation of Plaintiff's allegations and complaints and, as such, the ALJ was not obliged to discuss whether or why such were credited.[4] Importantly, I do not read the doctor's reports as including an opinion or comment

---

[3]It does not appear that the Eleventh Circuit has addressed this issue.

[4]Plaintiff does not challenge the ALJ's determinations with respect to her subjective allegations of pain and limitations.

12

as to Plaintiff's functional capacity.[5] Additionally, the objective portions of the doctor's records stand in contrast to Plaintiff's allegations.[6] Lastly, a review of the decision reveals that the ALJ did not fully credit the opinions of the non-examining doctors and did not accord them greater weight than that of examining doctors.[7] *See* (R. 19). The objective findings of Dr. Del Pizzo with regard to Plaintiff's neck, back, and leg pain appear consistent with the ALJ's residual functional capacity determination, and Dr. Del Pizzo's findings of (slightly) decreased fine manipulation do not equate with particular limitations resulting from Plaintiff's carpal tunnel syndrome. Of note, Plaintiff denied numbness and/or tingling in her hands on examination in 2007. *See* (R. 225, 227). In any event, the Commissioner is correct that an

---

[5]Here, the only physicians to comment on Plaintiff's residual functional capacity were the two non-examining, state agency doctors. Both of those doctors found that Plaintiff could stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. 162, 213). The first state agency doctor opined that Plaintiff could perform light exertional work with occasional postural limitations (R. 161-68), and the second state agency doctor opined that Plaintiff could perform light exertional work with occasional postural and environmental limitations (R. 212-19).

[6]On physical examination, while Dr. Del Pizzo found tenderness in the lumbar spine, bilateral paraspinal myalgia, and decreased range of motion, he also found that the joints showed no sign of inflammation, there were no motor deficits in the extremities, a straight leg raising test was negative bilaterally, and Plaintiff's motor power was 5/5. (R. 148-49). Upon a second examination, he opined that bilateral straight leg raising was negative, there was no sign of active joint inflammation, motor power was 5/5 and symmetrical, only six out of eighteen pain points could be elicited, and there were no motor deficits in the extremities. (R. 192-93). He also found that the range of motion in Plaintiff's hands and wrists was only slightly decreased. (R. 195). Further, Plaintiff denied numbness and/or tingling in her hands when examined by a treating source in 2007. (R. 225, 227).

[7]To this end, the ALJ stated "[a]s for the opinion evidence, the state agency reviewing physician indicated that the claimant had limitations consistent with the capacity for light exertional level work. Evidence obtained at the hearing level indicates that the claimant is slightly more limited tha[n] determined by this non-treating non-examining physician who did not adequately address the claimant's subjective complaints. The undersigned properly gives this opinion limited weight." (R. 19).

13

ALJ may rely on the opinions of non-examining doctors when the opinions are supported by other evidence of record. *Cf. Lamb*, 847 F.2d at 703 (reviewing doctors' opinions, when taken alone, do not constitute substantial evidence on which to base administrative decision); *see Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (findings of reviewing doctor can amount to substantial evidence where supported by other evidence in record); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (stating that ALJ may rely on assessment of nonexamining doctor where based on careful evaluation of medical evidence and assessment does not contrast those of examining doctor); Social Security Ruling 96-6p, 1996 WL 374180, at *3 (S.S.A.) (providing that, in certain circumstances, the opinions of reviewing sources may be entitled to more weight than the opinions of treating or examining sources).

In summary, a remand on the above grounds is not warranted.

By her last claim, Plaintiff argues that the ALJ erred by relying on the opinion of psychiatrist John P. Schosheim, M.D., the file-reviewing medical expert ("ME"), in determining that her psychological impairments were non-severe because the record fails to reveal exactly what records the ME reviewed when completing the form interrogatories provided to the ALJ. As grounds for challenging this, Plaintiff points to the ME's [mis]statement that she had not been treated in a pain clinic or sought any significant rehabilitation for her pain,[8] records from Dr. Joseph Chirillo that may not have been

---

[8]To demonstrate that the ME's statement was incorrect, Plaintiff cites to a Dr. Rosetta V. Cannata's note of "Pain Expanded Office Visit" in April and May 2001, a prescription for a Medrol Dose Pack by Dr. Fell in January 2002, Dr. Chirillo's notes from 2006 documenting her complaints of pain and prescriptions for pain medication. (Doc. 24 at 17-18).

14

considered by the ME because they were submitted only 20 days prior to the ME's review,[9] and that she had been prescribed medications for her depression but they did not help. Plaintiff urges the court to remand her case with instructions for the ALJ to submit all of the medical evidence of record to the ME and provide Plaintiff with a list of exhibits and evidence given to the ME. (Doc. 24 at 17-19).

The Commissioner counters that the ALJ properly relied on the ME's opinion in finding that Plaintiff's mental impairment was not severe. In the Commissioner's view, the ME's purported misstatement about Plaintiff's attendance at a pain clinic three years prior to her alleged onset date does not undermine his opinion regarding the severity of her mental impairment during the pertinent period. In any event, the Commissioner urges that the totality of the record fails to demonstrate that Plaintiff suffered a severe mental impairment. (Doc. 29 at 9-12).

Upon consideration, I find that Plaintiff is not entitled to relief on this claim. Here, the ALJ relied on the opinions of the nonexamining, state agency psychologist and the ME (a psychiatrist) in concluding that Plaintiff's claimed anxiety and depression did not constitute severe impairments under the Act.[10] (R. 15-16, 20). The ALJ also noted that their opinions

---

[9]On this point, Plaintiff cites to Dr. Chirillo's 2006 notations of prescribing three different pain medications, that she had been to "advance PT" and "freedom PT," that she was positive for depression and sadness but the previous medications she took did not help, and diagnoses of back pain, spinal stenosis, chronic pain, bilateral foot pain and radiculopathy, and neuropathy. (Doc. 24 at 18).

[10]In June 2005, Deborah L. Carter, Ph.D., a non-examining, state agency psychologist, concluded that Plaintiff did not have a severe mental impairment, noting that Plaintiff's only mental health treatment was couple's therapy; while Plaintiff appeared depressed, she did not have severe cognitive or memory problems or psychotic symptoms; Plaintiff was able to care

15

were consistent with the record as a whole, including the reports of Lynn R. Bernstein, Ph.D., who evaluated Plaintiff on two occasions upon request of the SSA.[11] (R. 169-70, 197-98). Contrary to Plaintiff's urging, I do not find that the ALJ significantly erred by relying (in part) on the opinion of the ME. As the decision reveals, the ALJ also relied on other opinions of record. Although Plaintiff is correct that the record does not identify or list the records the ME reviewed, I am unable to conclude that the omission renders the ALJ's severity finding unsupported. Neither Plaintiff nor her non-attorney representative objected to the admission of the ME's written interrogatories at the administrative hearing. Rather, the representative specifically indicated that he had no objection to the exhibits. (R. 233). This alone may defeat Plaintiff's claim. *See Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742, 744-45 (1st Cir. 1989) (holding that claimant cannot object to ME's opinion on grounds that opinion was not adequately explained where claimant has failed to question ME about his opinion).

---

for her herself, two children, and a dog; Plaintiff did routine daily tasks with some help; while Plaintiff wrote notes to remind herself, she was able to follow instructions; and Plaintiff goes out, socializes, and functions in the community. (R. 199, 210). Similarly, in completing interrogatories on Plaintiff's condition upon request of the ALJ, the ME opined that his review of the records did not reveal a significant psychiatric problem or evidence of treatment for psychiatric or psychological problems. He concluded that the documentation did not established evidence of any [mental] limitations. (R. 584-587).

[11]Dr. Bernstein diagnosed a pain disorder associated with both psychological factors and a general medical condition. (P. 170, 198). Mental status exam revealed that Plaintiff (1) was cooperative, relevant, and oriented x3, (2) evidenced a depressed mood and flat affect, (3) appeared to have average intellect and intact long term memory with variable attention and concentration with slow processing and errors on serial calculations, and (4) had accurate math computations, an understanding of concrete verbal analogies and proverbs, appropriate responses to social judgment questions, and intact reality thought processes. (R. 169-170, 198). Plaintiff told the psychologist that she was depressed due to pain. (R. 198). No mental limitations were noted.

To the extent Plaintiff suggests this was error in that the ALJ did not include all documentation on which he based his decision, I disagree. The ALJ here did so; the missing exhibit list provided to the ME provided the basis for the ME's assessment and not for the ALJ's decision. In any event, I conclude that the entirety of the record, including Plaintiff's own testimony, supports the ALJ's conclusion that Plaintiff's depression and anxiety did not constitute severe impairments.[12] Finally, as for Plaintiff's record citations, they do not bolster her claim.[13]

IV.

For the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is

---

[12]In addition to the psychological records set forth above, the record also reveals that Dr. Del Pizzo in September 2004 diagnosed a generalized anxiety disorder but only minimal cognitive impairment per Plaintiff's complaints. (R. 149). While he later documented Plaintiff's complaints of sleep disruption, irritability, anxiety, and depression, he again diagnosed only minimal cognitive impairment. (R. 193). The only other evidence addressing Plaintiff's mental impairments was that of another reviewing, state agency psychologist who opined that Plaintiff had "only a moderate reduction of functioning" reasonably attributable to a mental disorder. (R. 182). Although he identified specific moderate limitations (R. 184-85), Plaintiff does not challenge the ALJ's implicit rejection of such. In any event, I find that the record fully supports the ALJ's decision to discount such and any error in not articulating the same is harmless.

[13]Dr. Cannata's records predate her alleged onset date of May 2004 by approximately three years, and the Medrol Dose Pack prescription predates it by more than two years. *See* (R. 132-33, 143). In any event, these records do not necessarily contradict the ME's statement that "[s]he hasn't been treated in any pain clinic or sought any significant rehabilitation for her pain problem." (R. 584). And, they do not impact the decision with regards to Plaintiff's claimed mental impairments. As for the cases on which Plaintiff relies, I find that they do not speak directly to the issue raised herein.

17

otherwise supported by substantial evidence. The decision is affirmed. Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant and to close the case.

**Done and Ordered** at Tampa, Florida, this 10th day of July 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record